2014 BNH 001
_____

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                  Bk. No. 12-13683-JMD
                                                                        Chapter 7
Focus Capital, Inc.,
        Debtor

| | |
|---|---|
| *Peter N. Tamposi, Esq.* | *William S. Gannon, Esq.* |
| *The Tamposi Law Group* | *William S. Gannon PLLC* |
| *Nashua, New Hampshire* | *Manchester, New Hampshire* |
| *Attorney for Debtor* | *Attorney for the Straccia Parties* |
| | |
| *Peter C.L. Roth, Esq.* | *Mark C. Rouvalis, Esq.* |
| *Senior Assistant Attorney General* | *McLane, Graf, Raulerson & Middleton* |
| *Concord, New Hampshire* | *Professional Association* |
| *Attorney for William M. Gardner,* | *Manchester, New Hampshire* |
|    *Secretary of State* | *Attorney for Alfred Yezbick and Joseph and* |
|    *State of New Hampshire* | *Susan Hayden* |
| | |
| *Edmond J. Ford, Esq.* | *Gregory A. Moffett, Esq.* |
| *Ford & Associates, P.A.* | *Preti Flaherty Beliveau & Pachios, PLLP* |
| *Portsmouth, New Hampshire* | *Concord, New Hampshire* |
| *Attorney for Trustee Timothy P. Smith* | *Attorney for Trustee Joshua E. Menard* |

### MEMORANDUM OPINION

### I. INTRODUCTION

      Before the Court are a motion to dismiss and a motion for relief from the automatic stay (Doc. Nos. 130 and 132) (the "Motion to Dismiss" and "Motion for Relief" respectively or collectively the "Motions"). The movants are a group of creditors, Frances Straccia, Angela Straccia, Mark Straccia, Mary Beth Lambert, Ronald Ferrante, Sr., Anne Ferrante, and Ronald Ferrante, Jr. (collectively the "Straccia Parties"). Pre-petition, the Straccia Parties made

significant efforts to liquidate their claims against the Debtor.  The Straccia Parties contend their damages are recoverable from the Debtor's errors and omissions insurance policy.  In the Motion to Dismiss, the Straccia Parties ask the Court to dismiss this case for what they allege was a bad faith filing—according to them, the case has no bankruptcy purpose and was filed as part of a "scorched-earth" strategy to avoid the consequences of their extra-bankruptcy litigation.  In the Motion for Relief, they ask the Court to determine whether the automatic stay applies to the hypothetical proceeds of the errors and omissions insurance policy, and—if necessary—to grant relief and allow them to collect those proceeds.  Various parties, including the chapter 7 trustee, have objected to both of these Motions.  The Court shall deny the Motions.

The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334, 157(a), and U.S. District Court for the District of New Hampshire Local Rule 77.4(a).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTS

The Court draws the following uncontested facts from the pleadings and Debtor's bankruptcy schedules.  Additionally, the Court takes judicial notice of its docket.  The Debtor's president and majority owner is Nicholas Rowe.  Rowe filed his own bankruptcy petition contemporaneously with the Debtor's.  See Bk. No. 12-13684-JMD.  Some time during 2011,[1] a handful of the Debtor's clients—including the Straccia Parties—began to realize they were incurring massive losses on the investments the Debtor was managing.  The Straccia Parties were particularly aggressive in their attempts to recover their losses.  In early 2011, they notified the

---

[1] The record is unclear as to precisely when.

Debtor and its liability insurer, the Twin City Fire Insurance Company (the "Insurer")[2] of various claims of fraud, negligence, and breach of fiduciary duty that they were planning on asserting against the Debtor.

These claims implicated the Debtor's insurance policy, which is central to the dispute at issue. This policy, "The Hartford Premier Asset Management Protection Policy" (the "Policy"), provides that "the Insurer shall pay Loss on behalf of the Insureds resulting from a Claim first made against the Insureds during the Policy Period or Extended Reporting Period, if applicable, for a Wrongful Act in the Performance of Investment Advisor Professional Services by the Insureds."[3] The Policy is a "claims made" policy; it only covers claims which are first made against the Debtor and then only when the Insurer receives notice of the claims within 60 days after that. The Policy is also a wasting policy, which means that the aggregate coverage limit is reduced by the amount of any defense costs paid on behalf of the Debtor or other covered parties. The other covered parties relevant here include Rowe, as an officer of the Debtor.

Under the Policy, the Insurer is obligated to pay losses on behalf of the Debtor or Rowe. Losses include damages, settlements, or judgments that the Debtor or Rowe must pay. Losses must be incurred because of a wrongful act committed while the Debtor or Rowe were providing financial, economic and investment advice, or management services rendered in the capacity of an Investment Adviser. The aggregate coverage limit of the Policy is $2 million, with a limit of

---

[2] The pleadings also refer to the Insurance Company as "The Hartford," which parties identify as either an affiliate or parent company of the Twin City Fire Insurance Company. For the purpose of this Opinion, the exact parameters of the relationship between them is not material.

[3] Policy, at 1, Part I(C) "Insuring Agreements," attachment to chapter 7 trustee's objection to the Motion for Relief.

$1 million per claim—as "claim" is defined in the policy.

During 2011, the Straccia Parties instituted two separate actions against the Debtor and Rowe in an attempt to recover from the Policy. First, they filed a petition to attach in the Hillsborough County Circuit Court - Northern Division (the "State Court"). The Straccia Parties also filed claims against the Debtor with the Financial Industry Regulatory Authority ("FINRA") Office of Dispute Resolution. The Insurer paid for legal counsel to defend the Debtor and Rowe during these proceedings.

These proceedings continued well into 2012. During this time, the Insurer told the Straccia Parties that it viewed their claims as a "single-occurrence" under the policy, triggering the $1 million coverage limitation, less defense costs. In response, the Straccia Parties filed a declaratory judgment action, seeking to have the State Court determine that they could recover up to the entire $2 million aggregate limit of the policy. At this point, the Insurer removed the action to the U.S. District Court for the District of New Hampshire.

Around the same time, in August of 2012, the New Hampshire Bureau of Securities Regulation issued an Order to Cease and Desist and an Order to Show Cause, following an administrative adjudicative proceeding. These orders required the Debtor to cease violating the securities laws and show cause why the Debtor's investment advisor license should not be revoked. Eventually, the Debtor and Rowe voluntarily agreed to cease operating and to give up their professional licenses.

In late 2012, the FINRA arbitration panel awarded the Straccia Parties $1,820,701.58 in damages against the Debtor and Rowe. Several days later, on December 4, 2012, the Debtor filed its chapter 11 bankruptcy petition. The Debtor's schedules listed de minimis assets and

$7,520,353 in liabilities—the $2,000,000 contingent, disputed, unliquidated claim of the Straccia Parties and $5,520,353 in general unsecured claims. These unsecured claims consisted of additional claims of the Straccia parties as well as numerous claims of other former clients of the Debtor, whose claims were also scheduled as contingent, disputed, and unliquidated but in an unknown amount. The Debtor initially did not schedule the Policy as an asset, but eventually amended the schedules to list it in April 2013. See Doc. No. 103.

Soon after the filing of the bankruptcy petition, the Straccia Parties filed an emergency motion for relief from stay, requesting leave from the Court to prosecute the declaratory judgment action and recover the proceeds of the Policy. Among the Straccia Parties' arguments were that they were the only creditors entitled to the Policy's proceeds. The Court denied the motion as premature, stating that there were too many questions about who might be entitled to the insurance proceeds.

In an effort to maximize the value of the Policy for creditors, the Debtor succeeded in shortening the claims bar deadline for creditors seeking to recover from the Policy. See Doc. No. 38 (Motion to Shorten Proof of Claim Deadline); Doc. No. 58 (Order Shortening Proof of Claim Deadline). In its motion to shorten, the Debtor alleged that to recover on claims under the Policy creditors needed to file proofs of claim by February 28, 2013, at the latest. The Court granted this motion and shortened the deadline to February 20, 2013.

In early March 2013, the United States Trustee ("UST") moved to either appoint an independent chapter 11 trustee, or in the alternative convert the case to chapter 7. See Doc. No. 97. The UST asserted that given the allegations of Rowe's "gross mismanagement" of the Debtor that lead to suspension of the Debtor's investment advisor license and the filing of the bankruptcy

5

case, an independent trustee was needed to oversee the liquidation of the Debtor.  The UST also alleged that an independent trustee was needed to investigate any potential claims against insiders and affiliates of the Debtor.  The Debtor did not substantively oppose this Motion.[4]  The Straccia Parties filed a response to the UST's request to appoint a trustee or convert the case.  But, rather than simply responding, they affirmatively requested that the case be dismissed, raising arguments substantially similar to those they now assert, namely that the Debtor had filed the case in bad faith and that there was no purpose for the Debtor to remain in any chapter of the bankruptcy code.[5]

On April 25, 2013, the Court determined that cause existed to convert the chapter 11 case to chapter 7 and that it was in the best interests of the creditors and the estate to do so (Doc. No. 114) (the "Conversion Order").  Upon conversion to chapter 7, Joshua E. Menard was appointed the chapter 7 trustee (the "Trustee").  At this time, the Court also converted the chapter 11 case of Rowe to one under chapter 7.

Several months after conversion, the Straccia Parties filed the Motions now at issue.  In the Motion to Dismiss, they assert that the case should be dismissed because the Debtor had filed the chapter 11 petition in bad faith.  Specifically, the Straccia Parties argue that when the Debtor filed the petition there was no going concern to preserve, no bankruptcy purpose, and that subjectively, Rowe had caused the Debtor to file the chapter 11 petition out of personal animus for the Straccia Parties.  The Straccia Parties also assert that the interests of the general creditor

---

[4] The Debtor filed a "limited objection" but did not object to the ultimate relief requested by the UST.

[5] The Straccia Parties also raised an abstention argument under 11 U.S.C. § 305, which the Court does not need to delve into in this context as neither of the Motions raise the issue.

body would be best served by dismissal.

In the Motion for Relief, the Straccia Parties argue that, as a matter of law, the Policy and any proceeds were not property of the bankruptcy estate. They characterize their FINRA arbitration award as a "final judgment" that has the legal effect of exhausting the proceeds of the Policy and preventing any other creditor from sharing them. They assert that no other creditor can recover from the Policy because the Straccia Parties are the only creditors who have asserted claims within the meaning of the Policy. Finally, the Straccia Parties argue that even if the Court should determine the Proceeds are technically part of the estate, these same facts would require the Court to grant relief from the stay.

The Trustee, several creditors, the chapter 7 trustee of the Rowe bankruptcy estate, and the New Hampshire Secretary of State have all filed objections to the Motions.[6] They argue that the Motion to Dismiss should be denied because the Straccia Parties rest their argument on an inapplicable standard—the standard for dismissing a chapter 11 case in bad faith. The Trustee contends that the conduct of the Debtor and its principal at the time of the filing of the chapter 11 case is irrelevant to whether this chapter 7 case should remain in bankruptcy. He also argues that the Straccia Parties should be precluded from re-litigating issues that were raised, or could have been raised at the time of the conversion to chapter 7, such as whether it was in the best interests of creditors for the case to be dismissed. Finally, the Trustee argues that the Straccia Parties have not established a singular priority to the Policy proceeds, rather that they have nearly concluded,

---

[6] The Trustee has adopted the substantive arguments of the other parties into his opposition. For ease of discussion, the Court will simply refer to the arguments as the Chapter 7 Trustee's arguments as a convenient shorthand, recognizing that these arguments were each made by more than one party in interest.

but not yet finalized, the liquidation of their claims against the Debtor.  He asserts that their efforts, although not inconsiderable, do not preclude the liquidation of other claims similarly situated.

Several creditors have objected to the dismissal of this case.[7]  They argue that the Motion to Dismiss is nothing but an attempt of the Straccia Parties to gain an unfair portion of the insurance proceeds.  The creditors assert that dismissal of the case will result in the Straccia Parties claiming essentially all of the insurance proceeds.  These creditors support the Trustee overseeing a liquidation of the estate in chapter 7.

Responding to the Motion for Relief, the Trustee argues that the Policy and any of its proceeds would be property of the bankruptcy estate.  He asserts that he is in the best position to negotiate with the Insurer and to reach a favorable settlement for all creditors.  The Trustee argues that the applicable test to determine whether the Policy is property of the estate is whether the estate would be more valuable with the Policy than without; because the Policy covers liability that the Debtor would otherwise be responsible for, the estate is certainly worth more with the Policy.  The trustee further argues that the Straccia Parties should not be granted relief from the automatic stay because they are no different in the priority scheme than other creditors also entitled to the Policy proceeds.

The Court held a hearing on the Motions at which the Straccia Parties requested an opportunity to present evidence of the Debtor's bad faith filing.  The Court denied that request, stating that it would first decide whether that evidence would be germane to the ultimate

---

[7] These creditors are Thomas and Mary Jane Prolux, Sheila Groonell, Alfred E. Yezbeck, and Joseph and Susan Hayden.

determination of whether the chapter 7 case should be dismissed. After the hearing the Court took the Motions under submission.

**III. DISCUSSION**

There are three issues before the Court: (1) whether this case ought to be dismissed as a bad faith filing; (2) whether the Policy and its potential proceeds are property of the Debtor's bankruptcy estate; and (3) whether the Straccia Parties are entitled to relief from the automatic stay to complete the liquidation of their claims and recover the Policy proceeds. The Court shall address each issue in turn.

    A.    <u>Dismissal as a Bad Faith Filing</u>

The standard for dismissing a non-individual, chapter 7 case is set out in 11 U.S.C. § 707(a). This section provides:

> **(a)** The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including--
> **(1)** unreasonable delay by the debtor that is prejudicial to creditors;
> **(2)** nonpayment of any fees or charges required under chapter 123 of title 28; and
> **(3)** failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a). Bad faith, or lack of good faith is not one of the statutorily enumerated reasons for dismissal, but courts have held that the enumerated grounds in § 707(a) are not exclusive. <u>See, e.g.</u>, <u>In re Huckfeldt</u>, 39 F.3d 829, 831 (8th Cir. 1994) ("Use of the introductory word "including" means that these three types of "cause" are nonexclusive") (citing 11 U.S.C. § 102(3)); <u>In re Donnell</u> 234 B.R. 567, 573-74 (Bankr. D.N.H. 1999) ("Although § 707(a) provides

three examples of when cause will exist, it is generally understood that this listing is merely illustrative and not exhaustive.").

The Court has held in an unpublished, individual chapter 7 case that bad faith could constitute "cause" for dismissal under § 707(a).  In re Marisco, 2004 BNH 001, 2004 WL 97647 at *5 (Bankr. D.N.H. 2004) ("This Court shall adopt a less rigid and more objective standard for determining if bad faith exists and is sufficient to constitute cause for dismissal of a Chapter 7 petition under section 707(a)."). The Court has not—and need not now—extend that determination to whether a corporate chapter 7 liquidation proceeding can be dismissed for bad faith. The Straccia Parties have not requested that the Court dismiss the case for a bad faith filing in chapter 7. Instead, they have focused on the conduct of the Debtor exclusively relating to the filing of the chapter 11 petition. They have also solely relied on the standard for dismissing a chapter 11 case filed in bad faith.

The legal standard and supporting authority to which the Straccia Parties cite does not fit cogently in the context of a bankruptcy case that has been converted from chapter 11 to chapter 7. The Straccia Parties cite to cases discussing different aspects of bad faith in a chapter 11 filing. These cases require that a chapter 11 filing bear "some relation to the statutory objective of resuscitating a financially troubled corporation," and assess whether there is a going concern to preserve. In re Coastal Cable T.V., Inc., 709 F.2d 762, 765 (1st Cir. 1983); see Matter of Little Creek Dev. Co., 779 F.2d 1068, 1073 (5th Cir. 1986) ("Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's terminal euphoria.") (quotations omitted). If a filing fails to meet either of these conditions, bad

10

faith may be present. The Straccia Parties also cite to cases that examine the Debtor's motivation in filing a chapter 11 case. These cases look at whether the debtor wishes to cause hardship to a specific creditor, merely invoke the automatic stay, or otherwise abuse the reorganization process. See, e.g., Carolin Corp. v. Miller, 886 F.2d 693 (4th Cir. 1989).

      The Straccia Parties argue that the Debtor filed having no ability to reorganize (referring to the Debtor having lost its investment advisory license) and with the intent to frustrate the Straccia Parties' ability to collect the Policy proceeds after a hard-fought arbitration before FINRA. The Straccia Parties conclude that because of the lack of an ability to reorganize and the Debtor's bad faith motivation in filing, this case has no proper bankruptcy purpose. The Conversion Order renders their position at best moot, and at worst precludes them from raising the issue now. A central purpose of chapter 7 is an orderly liquidation of debts in line with the priority scheme set out in the Bankruptcy Code. See 11 U.S.C. § 507; Collier on Bankruptcy ¶ 700.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Liquidation is a form of relief afforded by the bankruptcy laws that involves the collection, liquidation and distribution of the nonexempt property of the debtor and culminates, if the debtor is an individual, in the discharge of the liquidation debtor.").

      The Straccia Parties insist that the bad faith chapter 11 filing is not cured by conversion to chapter 7: "Although this Case is now a liquidation proceeding, the conversion does not sanction or make a bad faith [c]hapter 11 filing into a good faith [c]hapter 7 proceeding because the subjective inquiry focuses on the Debtor's intent and the circumstances and facts as they existed on the [p]etition [d]ate." Mot. to Dismiss at 4. The Straccia Parties do not cite any case law to support that claim. The Court does not find the subjective intent of the Debtor's principal, Rowe,

to be relevant to the continuation of this chapter 7 proceeding.  An independent chapter 7 trustee has been appointed to oversee the estate; the matter is out of Rowe's hands.  Indeed, one of the reasons the Court converted the case to chapter 7 was so that a disinterested fiduciary could examine the assets of the estate and oversee their liquidation.

Finally, the Straccia Parties argue that dismissal is in the best interests of creditors.  The Court does not find this argument persuasive.  The Conversion Order was based upon this Court's determination that conversion, rather than dismissal, was in the best interests of the creditors and the estate.  The Straccia Parties did not appeal or seek to have that order altered or amended.  It is now a final order.  Accordingly, the Conversion Order is now preclusive on the issue of whether conversion or dismissal is in the best interests of creditors, foreclosing any argument regarding the filing of the chapter 11 petition and rendering moot any argument regarding the original chapter 11 filing which preceded the Conversion Order.  See In re Atl. Orient Corp., 2003 BNH 035, 2013 WL 25165192 at *2 (Bankr. D.N.H. 2003) ("Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been actually litigated and decided.  In order to effectuate the public policy in favor of minimizing redundant litigation, issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties.") (citations omitted).  Any dismissal at this point must be based on the events in the chapter 7 proceeding.

For these reasons, the Court shall deny the Motion to Dismiss and finds it unnecessary to hear evidence relating to the matter.

    B.    The Policy and its Proceeds

The Court must determine whether the Policy and its potential proceeds are property of the

bankruptcy estate under 11 U.S.C. § 541.  The Straccia Parties argue that neither the Policy nor the proceeds are estate property and that they may recover the proceeds without violating the automatic stay.  The corpus of the bankruptcy estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case."  § 541(a)(1).  Carbonneau v. Federal Nat'l Mortg. Ass'n (In re Carbonneau), 499 B.R. 166, 170 (Bankr. D.N.H. 2013).  "The majority view is that insurance policies are property of the bankruptcy estate and protected by the automatic stay provision of Section 362(a)(3) of the Code."  In re CyberMedica, Inc., 280 B.R. 12, 16 (Bankr. D. Mass. 2002) (citing MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 92 (2d Cir. 1988)).  The First Circuit holds with this majority view.  Tringali v. Hathaway Mach. Co., Inc., 796 F.2d 553, 560 (1st Cir. 1986).

Whether proceeds of an insurance policy are property of the estate is a more controversial question.  In Tringali, the court stated that "language, authority, and reason all indicate that proceeds of a liability insurance policy are 'property of the estate.'"  Id.  The policy in that case was, however, a pure liability policy. It did not cover the professional liability of directors and officers.  Where, as in this case, an insurance policy covers both liability of the corporate debtor and its directors and officers, courts diverge.  In re EMS Financial Servs., LLC, 12-71324-AST, 2013 WL 64755 at *5 (Bankr. E.D.N.Y. Jan. 4, 2013) ("Some courts have held that the proceeds of specific categories of policies—such as casualty, collision, life, or fire insurance—are property of the estate, especially when the debtor is a beneficiary of the policy and when the debtor (and not a third party) is the payee. Other courts have held that the debtor's right to indemnification under an insurance policy is sufficient to bring the policy's proceeds into the estate." (citing In re Edgeworth, 993 F.2d 51, 56 (5th Cir. 1993) (citations omitted)).

13

In <u>CyberMedica</u>, 280 B.R. at 13-14, the bankruptcy court analyzed an insurance policy covering the direct liability of the debtor and the liability of the debtor's directors and officers. Former directors and officers had been sued and wished the insurer to bear the costs of their defense, as provided in the insurance policy. The chapter 7 trustee opposed this attempt to gain access to the policy proceeds because it had the potential to deplete funds that might otherwise be available to the estate. The court applied what it termed a "fundamental test" to determine whether the policy proceeds were property of the estate. The test was whether the bankruptcy estate is worth more with the property than without. <u>Id.</u> at 17. The court found that the policy was "of benefit to the estate since the estate is worth more with it than without it because it insures the Debtor against indemnity and entity claims." <u>Id.</u> Accordingly, the court found that the proceeds were estate property.

In contrast, the Court of Appeals in <u>Edgeworth</u>, 993 F.2d at 51, in a somewhat different context, determined that the proceeds of an insurance policy were not property of the estate. A doctor had filed chapter 7 bankruptcy and obtained a discharge. Post-discharge, a party asked the bankruptcy court to permit a lawsuit to proceed against the doctor, so that the party could recover from the doctor's medical malpractice insurance. The suit related to pre-petition events, and the Debtor contended that the policy and the proceeds of the policy were property of the bankruptcy estate and unreachable through an extra-bankruptcy lawsuit. The <u>Edgeworth</u> court applied a different test than that of the court in <u>CyberMedica</u>. The court stated that:

> The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim. When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the

14

> bankruptcy estate. In other words, when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.

Edgeworth, 993 F.2d at 55-56. The court held that because the debtor could not recover the insurance proceeds—they would only be payable to a third party with a claim against the debtor—they were not property of the estate.

Here, the Court will apply the test from CyberMedica. The test articulated in Edgeworth provides too narrow a view as to what insurance proceeds will be estate property. This narrow view conflicts with the result in Tringali, the controlling precedent in this Circuit. In Tringali, the debtor filed its chapter 11 petition after it was held liable in a personal injury action. The question before the court was whether the personal injury victim could recover the proceeds of the insurance policy without running afoul of the automatic stay. The court held that the proceeds were estate property and that the stay applied. Under the Edgeworth test, because the personal injury victim and not the debtor would keep the proceeds, the proceeds would not be property of the estate. The result under the Edgeworth test is at odds with Tringali.[8]

Applying the Cybermedica test to the facts of this case leads to a straightforward result. The majority of the claims against the Debtor's estate, at this stage, appear to implicate the coverage in the Policy. These claims relate to losses suffered by claimants availing themselves of the Debtor's investment advisory services. Indeed, the Debtor established a separate bar date

---

[8] The Straccia Parties assert that the court should apply the Edgeworth test and cite this Court's decision In re Valentine, 2009 BNH 025, 2009 WL 3336081 (Bankr. D.N.H. 2009), a case in which the Court favorably cited the Edgeworth test. In Valentine—an unpublished decision—the Court determined that insurance policy proceeds were property of the estate and accordingly did not reach the issue of whether the test might lead to a conflict with the holding of Tringali in certain factual circumstances. This result makes sense as Edgeworth is the more restrictive standard. There will be times when a given result is harmonious with both decisions.

specifically to ensure that this type of creditor would be able to file a claim that would be covered under the Policy. The Policy, on its face, has the potential to provide coverage to this very type of claim. The Policy provides direct liability coverage to the Debtor for wrongful acts committed while acting as an investment advisor. Without the Policy proceeds, the estate will have little or nothing to pay these claims. The estate is worth more with the Policy and its proceeds than without.

The Straccia Parties argue that because they and not the Debtor would receive the insurance proceeds, that the Debtor has no equitable or legal interest in the insurance proceeds. This argument ignores the economic benefit the Policy provides to the estate. The Debtor paid the premiums on the Policy to guard itself against these type of claims. The Policy proceeds benefit the Debtor by covering claims it would otherwise be responsible to pay from other funds. The Policy thus provides a direct and substantial benefit to the estate and increases its value. Indeed, without the Policy proceeds the Debtor would have little or nothing to pay its debts.

Accordingly, the Policy and its proceeds are part of the bankruptcy estate.

C. <u>The Automatic Stay</u>

In the alternative, the Straccia Parties have requested relief from the automatic stay to conclude the liquidation of their claims and to collect the Policy proceeds. They argue that they are the only claimants who have made claims payable under the Policy and the only claimants who will be able to recover the proceeds. They conclude that this amounts to "cause" for relief from the automatic stay under § 362(d)(1). The arguments of the Straccia Parties in essence amount to an assertion that they are the only claimants who have liquidated claims payable under the Policy.

<u>Tringali</u> again provides guidance here. In <u>Tringali</u>, the court faced a similar situation. The

16

tort claimant asserted that it was the only creditor who had liquidated its claim and that it would be entitled to priority over any subsequent judgment creditor. Id. at 562. The court noted that "the very point of federal bankruptcy law is to substitute for a set of potentially varying preferences and priorities arising under other laws, a single rational federal system for dealing with legitimate claims that exceed in amount a limited set of assets." Id. Here, the Straccia Parties have done nothing except cite to state law supporting the position that their claims against the Debtor have been nearly liquidated. No one has disputed this point. The Straccia Parties have not pointed to any provision of state or federal law that would give them priority under the bankruptcy code over another similarly situated judgment creditor. Additionally, the Straccia Parties have provided no evidence that other claimants will not be able to liquidate their claims and they have not provided any evidence to support their assertion that the other claims will not be covered by the policy.

Courts that grant relief from the automatic stay for claimants to recover insurance proceeds have done so where the claimants may "suffer substantial and irreparable harm if prevented from exercising their rights." CyberMedica, 280 B.R. at 18 (permitting the officers of the debtor to obtain insurance proceeds to pay for their defense of claims covered by an insurance policy). See In re Allied Digital Tech. Corp., 306 B.R. 505, 513 (Bankr. D. Del. 2004) ("It is not uncommon for courts to grant stay relief to allow payment of defense costs or settlement costs to directors and officers, especially when there is no evidence that direct coverage of the debtor will be necessary."). The Straccia Parties have not shown that they will suffer any more harm than another creditor with a claim payable under the Policy. Accordingly, the Motion for Relief shall be denied.

## IV. CONCLUSION

For the reasons set forth above, the Court shall deny the Motions. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue separate orders consistent with this opinion.

ENTERED at Manchester, New Hampshire.

Date:   January 10, 2014                    /s/ J. Michael Deasy
                                            J. Michael Deasy
                                            Bankruptcy Judge